[No. A029155. First Dist., Div. Three. Apr. 27, 1987.]

FERNANDO TAFOYA et al., Plaintiffs and Appellants, v. HASTINGS COLLEGE OF THE LAW et al., Defendants and Respondents.

438

COUNSEL

Robert De Vries for Plaintiffs and Appellants.

Chris G. Gasparich, Peter W. Davis, James C. Martin and Crosby, Heafey, Roach & May for Defendants and Respondents.

OPINION

**BARRY-DEAL, J.**—The issue before us is whether the faculty meetings of the Hastings College of the Law (Hastings) are subject to the Bagley-Keene Open Meeting Act (Bagley-Keene Act or Act) (Gov. Code, §§ 11120-11131).[1] We hold that they are not.

### Procedural History

In March 1984, Fernando Tafoya, Kevin McCarthy, and Jackson Chin, Hastings students when the action was commenced,[2] filed a complaint for injunctive and declaratory relief against Hastings, members of the Hastings Board of Directors (Board), various Hastings deans, and certain Hastings faculty members (collectively referred to as Hastings). They allege that the faculty meets periodically in private, where it exercises certain authority delegated to it by the Board which, the students believe, "includes, but is not limited to, matters of educational policy, and the approval of expenditures from appropriations, gifts and endowments." The faculty, they allege,

---

[1] All further statutory references are to the Government Code unless otherwise indicated.

[2] Jackson Chin is not a party to this appeal. The other plaintiffs are no longer Hastings students.

was created by formal action of the Board, and the students believe that the faculty, through its private meetings, advises the Board on matters of educational policy and expenditures.

They further allege that, because the Board is a state body within the meaning of the Bagley-Keene Act, the faculty, which exercises delegated authority and advises the Board through its formal meetings, is also a state body within the meaning of the Act, and therefore the faculty meetings must be opened to the public under the mandate of the Act. They seek a declaration that the faculty is subject to the provisions of the Bagley-Keene Act and a mandatory injunction requiring the Board to enact rules to bring the faculty into compliance with the requirements of the Act.

Hastings demurred to the complaint on the ground that it failed to state a cause of action, in that the public meeting requirements governing the University of California (University) system, including Hastings, are set forth in the Education Code, not the Government Code, and the Education Code requires only that the meetings of the University's Board of Regents (Regents) (and certain of its committees) be publicly held.

The court sustained the demurrer, and plaintiffs waived their right to amend the complaint. The judgment was entered accordingly, and this appeal followed.

### Discussion

■ "On appeal, the plaintiff bears the burden of demonstrating either that a demurrer was sustained erroneously or that sustaining a demurrer without leave to amend was an abuse of discretion. [Citation.] A trial court's ruling sustaining a demurrer is deemed erroneous where a plaintiff has stated a cause of action under any possible legal theory. [Citations.] In assessing the sufficiency of a demurrer, all material facts pleaded in the complaint and those which arise by reasonable implication are deemed true. [Citations.]" (*Pollack* v. *Lytle* (1981) 120 Cal.App.3d 931, 939-940 [175 Cal.Rptr. 81].)

Plaintiffs argue here, as they did in the trial court, that Hastings faculty meetings are subject to the Bagley-Keene Act and must be open to the public because the Board is a state body and (1) the Board delegates authority to the faculty (§§ 11121.2, 11123), or, alternatively, (2) the faculty acts in an advisory capacity to the Board (§ 11121.8). Hastings replies that the Act does not apply to the Board or the faculty because Hastings enjoys the same limited immunity from legislative interference enjoyed by the University.

The Bagley-Keene Act requires that, except as otherwise provided, all meetings of a state body be open and public. (§ 11123.) The Act applies to

every state body unless the entity is specifically excepted by law or is covered by another conflicting statute. (§ 11127.) " '[S]tate body' " is defined, with exceptions not relevant here, as "every state board, or commission, or similar multimember body of the state which is required by law to conduct official meetings and every commission created by executive order . . . ." (§ 11121.) " '[S]tate body' " also includes "any board, commission, committee, or similar multimember body which exercises any authority of a state body delegated to it by that state body . . ." (§ 11121.2) or "any advisory board, advisory commission, advisory committee, advisory subcommittee, or similar multimember advisory body of a state body, if created by formal action of the state body or of any member of the state body, and if the advisory body so created consists of three or more persons." (§ 11121.8.)

Thus, the question before us is whether the Legislature intended to subject Hastings faculty meetings to the Bagley-Keene Act. If it did not, plaintiffs have failed to state a cause of action.[3]

In deciding whether Hastings faculty meetings are subject to the Act, we must first consider the relationship between the University and Hastings.

The University was created by statute in 1868 (Stats. 1867-1868, p. 248), with control over the University invested in the Regents. (*Estate of Royer* (1899) 123 Cal. 614, 617 [56 P. 461].) The Regents were authorized to "affiliate with the University, and make an integral part of the same," any incorporated college of law.[4] (*Foltz* v. *Hoge* (1879) 54 Cal. 28, 31.) The law

---

[3]In its points and authorities in support of its demurrer, Hastings asked the trial court to take judicial notice of a 1978 Board resolution by which the Board voluntarily agreed that its meetings would be open on the same terms as meetings of the Regents. In support thereof, the general counsel of Hastings filed a declaration that stated that the Board was voluntarily following the Regents' open meeting requirements. Plaintiffs did not oppose the request to take judicial notice. However, the record does not reveal whether the trial court granted the request.

Hastings did not request that this court take judicial notice of the Board resolution. Even if it had, this court would be limited to noticing only the existence of the declaration in the record, and not the truth of the facts contained therein, because Hastings did not include a copy of the resolution in the record. (See *Ramsden* v. *Western Union* (1977) 71 Cal.App.3d 873, 879 [138 Cal.Rptr. 426].)

In any event, whether open meetings for the Board are mandated by either the Bagley-Keene Act or by the constitutional provision requiring the Regents' meetings to be open is not directly at issue.

[4]The organic act declares that the University "shall consist of various colleges of arts, letters, and such other professional and other colleges as may be added thereto or connected therewith. Included in these are colleges of agriculture, mechanic arts, mines, civil engineering, medicine and law." (*Estate of Royer, supra,* 123 Cal. at p. 621.) Pursuant to that provision, "numerous colleges, schools, departments, and special institutions have been established within or affiliated with the university . . . ." (61 Cal.Jur.3d (1980) *Universities and Colleges,* § 11, pp. 112-113.)

school, however, was to retain control of its own property, with its own board of trustees, faculty, and president, and was to regulate its own affairs. (*Id.,* at pp. 31-32.) Article IX, section 9 of the Constitution of 1879 raised the status of the University to that of a constitutional department or function of state government. That section provided that the organization and government of the University should be perpetually continued in the form and character prescribed by the 1868 act which created it. (*Estate of Royer, supra,* 123 Cal. at pp. 619-620; *Williams* v. *Wheeler* (1913) 23 Cal.App. 619, 622-623 [138 P. 937].)

In 1878, the Legislature enacted "An Act to create Hastings' College of the Law, in the University of the State of California," which authorized S. C. Hastings to found a law college on the condition that he pay to the state treasury $100,000, to be refunded only if the college ceased to exist or the state failed to provide specified funds. (Stats. 1878, ch. CCCLI, at p. 533 et seq.) The act provided that the "College shall affiliate with the University of the State, upon such terms as shall be for the welfare of the College and University, and shall be the Law Department of the University." The enabling legislation, inter alia, empowered Hastings's Board to manage all the law school's business; the Board was to fill its own vacancies and appoint officers of Hastings; the dean was to be an ex officio faculty member of the University; and the Regents of the University were to grant diplomas to Hastings students. Thus, the Legislature's general plan for the organization and government of Hastings as an affiliate of the University was consistent in both the 1868 act creating the University and the 1878 act creating Hastings, even though there were some differences in the details. (*Foltz* v. *Hoge, supra,* 54 Cal. at p. 32.) Today, the relationship between the University and Hastings remains virtually unchanged. Education Code section 92201 specifically provides that Hastings "is affiliated with the University of California, and is the law department thereof." (See generally, Ed. Code, §§ 92200-92215 on Hastings.)

We next consider the applicability of the Bagley-Keene Act to the University.

■ The California Constitution grants broad autonomy to the University, subject to limited legislative interference. Article IX, section 9, subdivision (a) now provides, in pertinent part: "Sec. 9. (a) The University of California shall constitute a public trust, to be administered by the existing corporation known as 'The Regents of the University of California,' with full powers of organization and government, subject only to such legislative control as may be necessary to insure the security of its funds and compliance with the terms of the endowments of the university and such competitive bidding procedures as may be made applicable to the university by statute

for the letting of construction contracts, sales of real property, and purchasing of materials, goods, and services. . . ." Subdivision (f) adds, ". . . [The university] shall also have all the powers necessary or convenient for the effective administration of its trust, including the power to sue and to be sued, to use a seal, and to delegate to its committees or to the faculty of the university, or to others, such authority or functions as it may deem wise. . . . The university shall be entirely independent of all political or sectarian influence and kept free therefrom in the appointment of its regents and in the administration of its affairs . . . ." Thus, the University is intended to operate as independently of the state as possible. (*San Francisco Labor Council* v. *Regents of University of California* (1980) 26 Cal.3d 785, 788-789 [163 Cal.Rptr. 460, 608 P.2d 277]; *Ishimatsu* v. *Regents of University of California* (1968) 266 Cal.App.2d 854, 863-864 [72 Cal.Rptr. 756].)

When the Bagley-Keene Act was first enacted in 1967, the Legislature did not intend it to govern the meetings of the Regents. This is demonstrated by the information distributed to the electorate concerning the 1970 addition to article IX, section 9 of the Constitution of a provision requiring that the meetings of the Regents "shall be public, with exceptions and notice requirements as may be provided by statute."[5] (See 64 Ops.Cal.Atty.Gen. 875, 880 (1981).) In 1976, the Legislature implemented the 1970 constitutional amendment not by amending the Bagley-Keene Act, but by enacting Education Code section 92030, requiring the Regents' meetings to be open to the public, subject to a number of exceptions. It was not until 1982 that the Legislature amended Education Code section 92030 to provide specifically that the Regents' meetings were subject to the Bagley-Keene Act; the numerous exceptions were separately set forth in section 92032, subdivisions (b) through (g).[6] In 1982, the Legislature also added Education Code section

---

[5]"The voters were told that 'all other public, tax-supported agencies in the State are required to hold open meetings, either through the Brown Act, which applies to local agencies, or the State Open Meetings (Bagley) Act, which includes the State College Board of Trustees and all other State agencies.' (Ballot Pamp., Proposed Amends. to Cal. Const., Gen. Elec. (Nov. 3, 1970) p. 8.) The ballot proposition was the Legislature's proposal (Assem. Const. Amend. No. 12 (1969 Reg. Sess.)) and was expressly to be implemented by the language of Education Code section 92030 rather than including the Regents under the broad provisions of the Act. [¶] It is thus apparent that the Legislature did not intend for the Regents to be governed by the Act's provisions when the Act was first enacted in 1967 nor in 1970 when the constitutional amendment was added and implemented by what is now Education Code section 92030. . . ." (64 Ops.Cal.Atty.Gen., *supra,* at p. 880, fn. omitted.)

[6]Education Code section 92032, subdivisions (b) through (g), provides: "(b) The Regents of the University of California may conduct closed sessions when it meets to consider or discuss: [¶] (1) Matters affecting the national security. [¶] (2) The conferring of honorary degrees or other honors or commemorations. [¶] (3) Matters involving gifts, devises, and bequests. [¶] (4) Matters involving the purchase or sale of investments for endowment and pension funds. [¶] (5) Matters involving litigation, when discussion in open session concerning those matters would adversely affect, or be detrimental to, the public interest. [¶] (6) The acquisition or disposition of property, if discussion of these matters in open session could adversely

92020, defining the Regents to mean "the Board of Regents of the University of California and its standing and special committees or subcommittees, other than groups of not more than three regents appointed to advise and assist . . . in contract negotiations."

The legislative analyses of the proposed 1982 amendment of Education Code section 92030, and the addition of section 92020 defining "Regents," reveal that the Legislature was fully informed that the amendment would only mandate open meetings of the Regents and that faculty meetings were not affected. The staff consultant to the Assembly Education Committee commented that "This bill [Assem. Bill No. 2488, later enacted as Ed. Code, § 92030] does not address the fact that the UC Academic Senate, which derives its power from the Regents, will continue to hold closed session at will." (Assem. Ed. Com. analysis of Assem. Bill No. 2488 (1981-1982 Reg. Sess.) as amended Mar. 15, 1982.) The staff analysis of the Senate Committee on Education concluded that "Meetings of U.C. student body organizations are covered by the State Agencies Open Meetings Act; those of the U.C. academic senate are not." The legal affairs department of the Governor's office noted that "The bill reflects present Regent policies under existing law." Thus, we infer that the Legislature intended that only the meetings of the Regents and certain committees would be subject to the open meeting requirements of the Bagley-Keene Act and that the faculty meetings would be exempt. (See *Southern Cal. Gas Co.* v. *Public Utilities Com.* (1979) 24 Cal.3d 653, 659 [156 Cal.Rptr. 733, 596 P.2d 1149] ["Statements in legislative committee reports concerning the statutory objects and purposes which are in accord with a reasonable interpretation of the statute are legitimate aids in determining legislative intent. [Citation.]"].)

---

affect the regents' ability to acquire or dispose of the property on the terms and conditions it deems to be in the best public interest. [¶] (7) Matters concerning the appointment, employment, performance, compensation, or dismissal of university officers or employees, excluding individual regents other than the president of the university. [¶] (8) Matters relating to complaints or charges brought against university officers or employees, excluding individual regents other than the president of the university, unless the officer or employee requests a public hearing.

"(c) While a witness is being examined during any open or closed session, any or all other witnesses in the investigation may be excluded from the proceedings by the regents.

"(d) Committees of the regents may conduct closed sessions on Medi-Cal contract negotiations.

"(e) The nominating committee of the regents may conduct closed sessions held for the purpose of proposing officers of the board and members of the board's various committees.

"(f) Committees of the regents may conduct closed sessions held for the purpose of proposing a student regent.

"(g) The regents shall not be required to give public notice of meetings of special search or selection committees held for the purpose of conducting interviews for university officer positions."

We agree with the analysis of the Attorney General, who has concluded that even though the Legislature subjected the meetings of the Regents and certain of its committees to the provisions of the Bagley-Keene Act, it did not intend the Act to apply to bodies that advise the Regents or that exercise authority delegated to them by the Regents. (See 66 Ops.Cal. Atty.Gen. 458, 461 (1983).) The Attorney General noted that the Legislature, instead of amending the Bagley-Keene Act to include the Regents in the definition of a "state body," has amended Education Code section 92030 to provide that the meetings of the Regents are subject to the Act and has added section 92020 to define narrowly the meaning of Regents. (66 Ops. Cal.Atty.Gen., *supra,* at pp. 460-461.) The Attorney General concluded that ". . . it appears that the Legislature intended for the Regents to be treated in a particular manner under the provisions of the Education Code and not as a 'state body' under the Government Code provisions. Only the meetings of those entities specified in Education Code section 92030 come within the scope of the Act; by omitting any reference to advisory bodies or bodies that exercise authority delegated to them by the Regents, the Legislature has indicated that the Act's requirements are inapplicable to such bodies." (*Id.,* at p. 461.)[7] We agree with this conclusion.

We now consider the applicability of the Bagley-Keene Act to Hastings.

Appellants correctly point out that the constitutional immunity from legislative control granted to the University is not specifically extended to Hastings. Therefore, they argue, the Board of Hastings is a state body as defined in the Bagley-Keene Act, and the faculty which advises the Board or exercises authority delegated by the Board must have open meetings as mandated by the Act. We do not agree with their reasoning because they fail to consider the special position occupied by Hastings in the legislative design for public higher education in California.

Although Hastings is unique as an institution of higher education, the Legislature has expressed no intention to treat it as an entity independent of the University. The Legislature has provided in Education Code section 66010 that "[p]ublic higher education consists of (a) all public community colleges, (b) the California State University, and each campus, branch, and function thereof, (c) each campus, branch, and function of the University of California, and (d) the California Maritime Academy." Hastings is not included as one of the branches of public higher education, but rather is classified as one of the two special colleges affiliated with the University, the

---

[7]Although the opinions of the Attorney General are not controlling as to the meaning of a constitutional provision or statute, they are entitled to great weight and respect. (*Unger* v. *Superior Court* (1980) 102 Cal.App.3d 681, 688 [162 Cal.Rptr. 611]; *Sonoma County Bd. of Education* v. *Public Employment Relations Bd.* (1980) 102 Cal.App.3d 689, 699 [163 Cal.Rptr. 464].)

other being the California College of Medicine. (See Ed. Code, §§ 92201 and 92230.) Webster's Third New International Dictionary (1970) page 35, defines an "affiliate" as "1: ... ASSOCIATE ... 2a: a branch or unit of a larger organization ... b(1): a company effectively controlled by another or associated with others under common ownership or control (2): SUBSIDIARY."[8]

The Legislature has specifically provided that the meetings of the governing board of the community colleges (Ed. Code, § 71022), the governing board of each state university (Ed. Code, § 89920), and the meetings of the Regents of the University (Ed. Code, § 92030) shall be open to the public. Again, the Legislature has not included Hastings as an entity subject to the requirement of open meetings, which is consistent with Hastings's status as an affiliate or branch of the University.

Further, the Legislature has provided that the University "shall have exclusive jurisdiction in public higher education over instruction in the profession of law and over graduate instruction in the professions of medicine, dentistry, and veterinary medicine. ..." (Ed. Code, § 66500.)

The Legislature has expressly identified certain areas of the University's supremacy over Hastings: e.g., Hastings is directed to matriculate students who reside at the University (Ed. Code, § 92202); the faculty [Regents] of the University grants the students' diplomas (Ed. Code, §§ 66500, 92203); the property on which the law school is located is held by the University for the benefit of the law school (Ed. Code, § 92214). Yet, Hastings's Board has been given the authority to manage the business of the college. (Ed. Code, § 92204.) The necessity to define the parameters of the autonomy or independence enjoyed by Hastings, however, has seldom arisen.

In the leading case of *Foltz* v. *Hoge, supra,* 54 Cal. 28, where a female applicant for admission challenged the autonomy of Hastings when it attempted to exclude her from the student body, our Supreme Court, in ruling against Hastings, declared, "It was, in our opinion, the intent of the Legislature, that the College, when established, should affiliate with the University, and be governed by the laws applicable to the University, except as otherwise provided, either in the Act of 1868 or the Act of 1878; *that the University and the affiliated College should constitute one institution and be governed by the same laws,* with only such special provisions as might be required for the harmonious operation of its different branches. That would

---

[8]The dictionary defines the verb, to "affiliate," as follows: "... la: to attach as a member or branch: bring or receive *into* close connection ... b: to join as a member: ASSOCIATE ... 2: to fix the paternity of (an illegitimate child)—used with *to* ... ; *broadly*: to connect in the way of descent: trace the origin of ... : to connect or associate oneself: COMBINE—usu. used with *with* ..." (Webster's New Internat..Dict., *supra,* at p. 35.)

seem to be the necessary result of the affiliation of a College with the University. . . . An affiliation imports a subjection to the same general laws and rules that are applicable to the parent institution, with such special exceptions as may expressly be made, and such as arise from the very nature and purpose of the affiliated institution." (*Id.*, at pp. 33-34, italics added.)

In *People* v. *Kewen* (1886) 69 Cal. 215, at page 216 [10 P. 393], the Supreme Court described Hastings as constituting "a portion of the university" and invalidated legislation which altered Hastings's form of government. The court reasoned that "[t]he constitution of 1879 (art. 9, sec. 9) declared that the university should be continued in the form and character prescribed in the acts then in force, subject to legislative control for certain specified purposes only. Such being the case, it was not competent for the legislature, by the act of March 3, 1883, or that of March 18, 1885, or by any other act, to change the form of the government of the university, *or of any college thereof then existing.*" (Italics added.)[9]

Thus, in the only two cases concerning the status of Hastings to reach our highest court, it has affirmed that Hastings is an affiliate of and governed by the same laws as the University.

■　The Legislature is presumed to be cognizant of judicial decisions relevant to the subject matter of a statute (*People* v. *Overstreet* (1986) 42 Cal.3d 891, 897 [231 Cal.Rptr. 213, 726 P.2d 1288]), and we assume that in passing a statute, the Legislature acted with full knowledge of the state of the law at the time (*In re Misener* (1985) 38 Cal.3d 543, 552 [213 Cal.Rptr. 569, 698 P.2d 637]). The Legislature was aware of *Foltz* v. *Hoge, supra,* 54 Cal. 28, and *People* v. *Kewen, supra,* 69 Cal. 215, as well as its own statutory provisions relating to Hastings.

■　A statute must be construed toward giving it meaning and effect. (*East Bay Municipal Utility Dist.* v. *Appellate Department* (1979) 23 Cal.3d 839, 843 [153 Cal.Rptr. 597, 591 P.2d 1249].) One rule of construction

---

[9]Appellants argue that the 1980 amendments to the Education Code increasing the number of directors on Hastings's Board and providing that vacancies be filled by the Governor indicate that the Legislature intends to exert direct control over Hastings. This argument does not convince us that the Legislature intended to treat Hastings as a body independent of the University. Former Education Code section 92206, based upon the 1878 act creating Hastings, provided that vacancies in the Board should be filled by the Board. In 1980 the section was amended to provide that vacancies occurring on the Board, other than through the death or resignation of the heir or representative of S. C. Hastings, should be filled by the Governor. (Stats. 1980, ch. 1155, § 31.8, p. 3855.) The amendment, however, did not purport to change the form of Hastings's government and was not challenged by Hastings. Amendments to Education Code sections 92204 (increasing to six the number of directors required for a quorum) and 92207 (increasing the number of directors to eleven) also had no effect on Hastings's form of government.

provides that where the same subject matter is covered by inconsistent provisions, one of which is special and the other general, the special one, whether or not enacted first, is an exception to the general statute and controls unless an intent to the contrary clearly appears. (*Consumers Union of U.S., Inc.* v. *California Milk Producers Advisory Bd.* (1978) 82 Cal.App.3d 433, 446 [147 Cal.Rptr. 265].) Here, the special statute provides that Hastings is "affiliated with the University." (Ed. Code, § 92201.) No other statute purports to alter that relationship.

■ We conclude that the Legislature did not intend to subject either the Hastings Board or its faculty to the Act's provisions. It is clear that the Legislature intended Hastings to constitute a branch of the University, governed by the same laws. In addition, no faculty of any University campus, including that of Hastings, is subject to the Act. We need not decide whether the California Constitution requires the Board to meet publicly because the issue is not before us.

Appellants have failed to state a cause of action, and the judgment is affirmed.

White, P. J., and Scott, J., concurred.

A petition for a rehearing was denied May 26, 1987, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied July 16, 1987.